DAVID J. VAN HAVERMAAT, Cal. Bar No. 175761
E-mail: vanhavermaatd@sec.gov
LESLIE A. HAKALA, Cal. Bar No. 199414
E-mail: hakalal@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Acting Regional Director
John M. McCoy III, Associate Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>ARVCO CAPITAL RESEARCH, LLC, ARVCO FINANCIAL VENTURES, LLC, ALFRED J.R. VILLALOBOS, and FEDERICO ("FRED") R. BUENROSTRO,<br><br>Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of

1

the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), & 78aa. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

2. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

3. This matter involves a fraudulent scheme perpetrated by Federico R. Buenrostro, the former Chief Executive Officer of the California Public Employees' Retirement System ("CalPERS"), and his close personal friend, Alfred J.R. Villalobos ("Villalobos"), a placement agent who successfully convinced CalPERS and other public pension funds to invest in his clients, mostly private equity funds. Operating through two of his companies, ARVCO Capital Research, LLC and ARVCO Financial Ventures, LLC (collectively, "ARVCO"), Villalobos generated more than $70 million in placement agent fees over an approximately 10 year period, at least $58 million of which was related to CalPERS' investments.

4. Over at least a decade, Villalobos developed a longstanding (and extremely lucrative) relationship with one particular investment manager, Apollo Global Management ("Apollo"). In 2007, Apollo began to require signed "Investor Disclosure" letters from investors (such as CalPERS) from whom it raised money with the assistance of a placement agent (such as ARVCO) before Apollo would pay that placement agent any fees. ARVCO first agreed to this contractual provision in its placement agent agreement regarding Apollo Fund VII during the Summer of 2007. Just before the closing of CalPERS' investment in Apollo Fund VII in August 2007, ARVCO's General Counsel emailed CalPERS'

2

Investment Office to request that it sign the applicable investor disclosure letter. A few hours later, CalPERS informed ARVCO that it had been advised by counsel not to sign the disclosure letter. ARVCO did not contact CalPERS' Investment Office about investor disclosure letters ever again.

5. Over the next few months, Apollo's counsel repeatedly asked ARVCO for the signed CalPERS disclosure letter for Fund VII, and Apollo refused to pay ARVCO any placement agent fees on the CalPERS investment until it received the letter. Finally, on January 2, 2008, ARVCO's counsel and Apollo's counsel discussed whether Apollo should contact CalPERS directly to request the signed disclosure letter. Instead, however, Villalobos generated a letter using the CalPERS logo on Buenrostro's business card and, at Villalobos's request, Buenrostro signed what appeared to be a Fund VII disclosure letter purportedly on behalf of CalPERS.

6. As described in detail below, Villalobos and Buenrostro engaged in an ongoing scheme utilizing this and other false documents to create the false impression that a series of purported placement agent fee disclosure letters had been properly reviewed and approved by CalPERS in accordance with its established procedures, when in fact the defendants had actively and intentionally bypassed and subverted those procedures. Upon receipt of the fabricated Fund VII disclosure letter, Apollo paid ARVCO about $3.5 million in placement agent fees. Less than two weeks later, Villalobos and Buenrostro created fabricated CalPERS documents regarding at least four more Apollo funds, under equally suspicious circumstances. As part of the scheme, Buenrostro signed blank sheets of (fake) CalPERS letterhead, which Villalobos and ARVCO used to generate investor disclosure letters as needed (by running the paper through a printer a second time). In aggregate, based on these fabricated documents, Apollo was induced to pay ARVCO more than $20 million in placement agent fees it would not otherwise have paid without the disclosure letters.

7. The Defendants, by engaging in the conduct described in this complaint, have all violated the antifraud provisions of the federal securities laws.

8. By this complaint, the Commission seeks a permanent injunction, disgorgement with prejudgment interest, and civil penalties against all Defendants.

## THE DEFENDANTS

9. **Alfred J.R. Villalobos:** Villalobos, age 68, resided in Zephyr Cove, Nevada at all relevant times. He is the founder, managing director, control person, and key representative of ARVCO Capital Research, LLC and ARVCO Financial Ventures, LLC.

10. **Federico ("Fred") R. Buenrostro:** Buenrostro, age 62, resides in Zephyr Cove, Nevada. He was CalPERS' CEO from late 2002 through June 30, 2008. The day after retiring from CalPERS, he began working at ARVCO.

11. **ARVCO Capital Research, LLC:** ARVCO Capital Research, LLC is a limited liability company organized (but currently in default) under the laws of the State of Nevada with its principal place of business in Stateline, Nevada. ARVCO Capital Research acted as a placement agent for private equity funds and other money managers that sought investments from public pension funds. It ceased operations in May 2009, and filed for bankruptcy in June 2010.

12. **ARVCO Financial Ventures, LLC:** ARVCO Financial Ventures, LLC is also a limited liability company organized (but in default) under the laws of the State of Nevada with its principal place of business in Stateline, Nevada. ARVCO Financial Ventures registered with the Commission as a broker-dealer in May 2009 and continued ARVCO Capital Research's business. ARVCO Financial Ventures has been largely defunct since 2010, and withdrew its broker-dealer registration in February 2011.

# THE FRAUDULENT SCHEME

## A. Background

13. Villalobos served on the Board of Directors of CalPERS from 1992 to 1995. During his tenure, Villalobos became close friends with several members of the CalPERS Board, including Buenrostro. Those relationships continued long after Villalobos left his position at CalPERS. From 1995 to 1997, Villalobos worked as an independent consultant for a prominent investment bank's placement agent group, using his connections at various pension funds to make investment introductions.

14. In 1997, Villalobos left that position to work at his own placement agent firm, ARVCO Capital Research, LLC (and later with its successor entity ARVCO Financial Ventures, LLC), which primarily solicited private equity investments from CalPERS and a few other public pension funds. By capitalizing on his personal relationships with Buenrostro (who became CalPERS' Chief Executive Officer in 2002) and others, Villalobos enjoyed considerable success in securing massive capital commitments for his clients. Overall, as a result of their placement agent activities related to CalPERS, Villalobos and ARVCO received approximately $58 million in fees.

15. Chief among Villalobos's clients was Apollo Global Management, a New York-based private equity firm. Apollo registered with the Commission as an investment adviser in the Spring of 2007. In June 2007, CalPERS invested directly in Apollo, acquiring approximately 10% of Apollo's non-voting shares for about $600 million.

16. Sometime in the first half of 2007, Apollo began to require a signed "Investor Disclosure" letter from an investor (such as CalPERS) from whom it raised money with the assistance of a placement agent (such as ARVCO) before it would pay that placement agent. The disclosure letters were single-page documents that generally required an investor to acknowledge that (1) the

5

placement agent was to be paid a specific fee for the investment; (2) the cost to the investor of its investment was not increased by the placement fee; and (3) prior to investing, the investor had received certain documents.

### B. The First Fabricated Investor Disclosure Letter *(Apollo Fund VII)*

17. In July 2007, ARVCO and Apollo negotiated and executed a written placement agent agreement regarding fundraising for Apollo Fund VII. That agreement required ARVCO to provide Apollo with investor disclosure letters signed by the investors that ARVCO had solicited before those investments closed, and the form of investor disclosure letter that Apollo required was attached as an exhibit to the ARVCO-Apollo Fund VII agreement.

18. CalPERS agreed to invest in Fund VII's first closing, scheduled for late August 2007. On August 23, 2007, ARVCO's General Counsel (who was also Villalobos' daughter) emailed CalPERS' Senior Portfolio Manager a copy of a Fund VII investor disclosure letter, and asked him to sign and return the letter promptly. Because the Senior Portfolio Manager had never seen such a document before, he sought guidance from both in-house counsel and CalPERS' outside law firm. A few hours later that same day, the Senior Portfolio Manager notified ARVCO's General Counsel in writing that he had "been advised by [CalPERS'] Legal Office that [he] should not sign" the letter and that she should contact CalPERS' counsel if she had any questions. Shortly thereafter, ARVCO's General Counsel informed Villalobos of CalPERS' decision. Neither the Senior Portfolio Manager nor anyone else at CalPERS (except Buenrostro) ever heard about this or any other investor disclosure letter again.

19. Notwithstanding ARVCO's failure to provide an executed disclosure letter from CalPERS, Apollo proceeded with the Fund VII closing as planned. For the next four months, Apollo's outside counsel at the time, a large national law firm, repeatedly asked ARVCO's General Counsel about the missing disclosure

6

letter from CalPERS. ARVCO's General Counsel repeatedly said that she would follow up, but nothing happened.

20. Finally, on the morning of January 2, 2008, ARVCO's General Counsel spoke by telephone with the partner at Apollo's outside law firm who was responsible for Fund VII. The two lawyers discussed the accuracy of certain representations in the disclosure letter and the possibility that Apollo might contact CalPERS directly to request the signed document. The call ended shortly thereafter. CalPERS was never contacted, yet Apollo's counsel received what purported to be a signed disclosure letter from CalPERS just days later.

21. The following sequence of events on Wednesday, January 2, 2008, reflects the true origins of the letter received by Apollo's counsel:

    a. Morning – Call between counsel for ARVCO and Apollo (described above).

    b. 8:39 am – Villalobos called Buenrostro on his cell phone and spoke with him for seven minutes.

    c. 3:00 pm – Villalobos and Buenrostro scheduled to meet.

    d. 3:01 pm – CalPERS' two-color logo was saved to ARVCO's computer system as a bitmap file. The logo image was the exact size and color design as the CalPERS logo on Buenrostro's business card.

    e. 5:21 pm – Apollo's Director of Marketing, who was in charge of Apollo's fundraising activities, returned a telephone call from Villalobos. They spoke for 17 minutes. During the call, Villalobos assured her that Apollo would receive the CalPERS investor disclosure letter for Fund VII soon.

    f. 6:17 pm – A FedEx shipping label was created online, using ARVCO's FedEx account number, to send an

7

envelope from "Fred Buenrostro, CalPERS" using a Sacramento address to Apollo's outside law firm in New York.

22. The next day, January 3, 2008, that envelope was picked up by the FedEx distribution center that services the South Lake Tahoe area (not Sacramento). On Friday, January 4, 2008, FedEx delivered the envelope to Apollo's outside counsel.

23. Apollo's outside counsel received what appeared to be an executed Fund VII disclosure letter from CalPERS, signed by "Fred Buenrostro, Chief Executive Officer." Buenrostro signed the Fund VII letter after Villalobos told him that CalPERS' Investment Office had refused to sign it and without discussing the matter with anyone at CalPERS.

24. The Fund VII letter contained numerous obvious as well as subtle irregularities:

   a. The letter purported to be on CalPERS' letterhead, but the CalPERS logo was on the wrong side of the page and CalPERS' address was missing. When he signed the letter, Buenrostro knew the logo was on the wrong side of the page. Also, the logo on the letter was blue and gray, but CalPERS only used that two-color logo on preprinted, engraved materials such as business cards.

   b. Buenrostro signed the document on behalf of "California Public Employees Retirement <u>Fund</u>/CalPERS" (emphasis added), which was not the correct name of the institution that he had led for the preceding five years.

   c. Buenrostro dated the letter "11/20/07," about six weeks before lawyers for ARVCO and Apollo spoke in January 2008 about the need to receive the signed investor disclosure letter.

8

    d.  The document was printed on a printer that Villalobos bought and kept in ARVCO's office in Zephyr Cove, Nevada.

  25. Roughly half an hour after the FedEx envelope was delivered to Apollo's outside counsel, Villalobos called Apollo's Director of Marketing and left a message asking her to call him back. Over the next several days, Villalobos repeatedly tried to contact her to confirm receipt of the signed disclosure letter.

  26. Apollo refused to pay ARVCO placement agent fees related to a particular investor until Apollo received that investor's signed disclosure letter. Indeed, Apollo did not pay ARVCO for successfully soliciting another California public pension fund's investment in Fund VII simply because that investor told Apollo's outside counsel that it would not sign the investor disclosure letter. With the purported CalPERS letter in hand, however, Apollo paid ARVCO approximately $3.5 million in placement agent fees related to CalPERS' investment in Fund VII.

  **C.** **The Second Set Of Fabricated Investor Disclosure Letters _(AP Investment Europe Limited, AP Investment Asia Limited, Apollo Special Opportunities Managed Account, Apollo European Principal Finance Loan Fund)_**

  27. CalPERS also agreed to invest in three other funds being offered by Apollo: (1) AP Investment Europe Limited ("AIE"), (2) Apollo Special Opportunities Managed Account ("SOMA"), and (3) Apollo European Principal Finance Loan Fund ("EPF").

  28. In early January 2008, Apollo and ARVCO had not yet completed or executed placement agent agreements regarding these funds. Nonetheless, just a few days after sending in the CalPERS Fund VII disclosure letter, Villalobos started tackling the next set of investor disclosure letters to submit to Apollo. To further their scheme, Buenrostro signed blank sheets of paper provided to him by ARVCO that had no text, but only the fake CalPERS logo at the top of the page

1  and his signature block at the bottom. Buenrostro gave these pages to Villalobos to
2  use for ARVCO's benefit.
3      29.   On Thursday, January 10, 2008, in the afternoon, Villalobos and
4  Apollo's Director of Marketing spoke briefly by phone. The next day, Friday,
5  January 11, 2008, attorneys at Apollo's outside law firm worked on preparing two
6  form investor disclosure letters to be executed by CalPERS regarding its
7  investments in AIE and SOMA. On Saturday, January 12, 2008, Apollo's Director
8  of Marketing called Villalobos in the morning and then spoke to Apollo's in-house
9  counsel. In-house counsel promptly informed Apollo's outside counsel that the
10 form disclosure letters had to be completed that night because Villalobos was
11 going to meet with CalPERS the next day (a Sunday). Even though the underlying
12 placement agent agreements had not been finalized, two senior attorneys at the law
13 firm worked into the night to complete the form investor disclosure letters and
14 email them to ARVCO's General Counsel.
15     30.   The following morning, Sunday, January 13, 2008, ARVCO's
16 General Counsel forwarded the two form disclosure letters she had received from
17 Apollo's lawyers to one of her father's assistants. In her email to the assistant, she
18 wrote, "Here's [sic] the forms my dad needs. Please make sure you save them in
19 Apollo's project folder in their completed form."
20     31.   Beginning around 11:00 am that Sunday morning, the assistant
21 prepared investor disclosure letters for four Apollo investment funds, based on the
22 language Apollo's counsel had first sent to ARVCO's counsel the night before.
23 The assistant used the same (fake) CalPERS letterhead that had been used on the
24 previous Fund VII letter, but did get the pension fund's full name right. The
25 assistant saved each Microsoft Word document (complete with the two-tone
26 CalPERS logo) on the ARVCO computer server, and two copies of each of the
27 four letters were printed in ARVCO's office.
28

1  32. That Sunday evening, a shipping label was created online using ARVCO's FedEx account to send an envelope to Apollo's outside law firm in New York. On Monday, January 14, 2008, FedEx picked up the envelope in San Diego (where Villalobos had traveled to a meeting). It was delivered to Apollo's counsel on Tuesday, January 15, 2008. The four pairs of letters were scanned onto Apollo's outside law firm's computer system on or about January 24, 2008, and were sent to Apollo around February 6, 2008. All eight of the letters bore Buenrostro's original signature.

33. Like the Fund VII letter, each pair of letters in this tranche contained significant irregularities (in addition to the ones noted above):

    a. One pair of letters pertained to CalPERS' alleged investment in AP Investment Asia Limited, *but no such fund ever existed*. Apollo and ARVCO had discussed an Asia fund at the same time that they discussed AIE (AP Investment Europe Limited), but the Asia version never gained traction. Lacking any meaningful understanding of Apollo's investment offerings, Villalobos' assistant prepared investor disclosure letters for the nonexistent fund.

    b. Buenrostro wrote the date "11/20/07" on the letters for three of the funds (AIE, SOMA, and the Asia fund); Buenrostro wrote the date "1/11/08" on the letters for the fourth fund (EPF). Both dates, however, were temporally impossible, because the letters repeated – verbatim – the language that Apollo's counsel had first sent to ARVCO's counsel on January 12, 2008.

34. The four sets of letters reflected other anomalies as well. For example:

    a. The AIE placement agent agreement itself was not executed until January 25, 2008, over a week after Apollo's outside

11

counsel had received the corresponding signed disclosure letters.

    b.    The EPF placement agent agreement, which was not signed until February 20, 2008, required materially different investor disclosure language than the language in the letters Apollo had already received.

    c.    The SOMA placement agent disclosure letters were purportedly signed in November 2007 and actually given to Apollo in January 2008, but Apollo and ARVCO continued to negotiate the size and terms of the placement agent fee into late March 2008 and no written agreement was ever reached.

35.    Having received what purported to be investor disclosure letters signed by CalPERS, Apollo paid ARVCO placement agent fees of about (1) $8,000,000 for SOMA, (2) $625,000 for AIE, and (3) $375,000 for EPF.

    C.    **The Final Investor Disclosure Letter _(Apollo Credit Opportunity Fund I)_**

36.    Sometime around May 10, 2008, ARVCO's General Counsel and an in-house attorney for Apollo began exchanging drafts of a placement agent agreement regarding Apollo Credit Opportunity Fund I, L.P. ("ACOF"). The placement agent fee disclosed in the proposed investor disclosure letter attached to the draft agreement evolved from a range of "between 0.50% and 4.0% of CalPERS capital commitment" (in the May 10, 2008 draft) to "0.625% of CalPERS capital commitment" (in the June 9, 2008 draft). Finally, on June 19, 2008, Apollo's in-house counsel sent ARVCO's General Counsel a revised agreement and disclosure letter that specified that Apollo would pay ARVCO exactly $9,250,000 in placement agent fees. In her cover email, the Apollo attorney wrote, "Once signed *and upon receipt of a signed Disclosure [sic] by CalPERS* ... we will be able to release your first payment." (Emphasis added.)

12

1 | Without any discussion, ARVCO switched the form disclosure letter attached to
2 | the final agreement back to the prior version with the broad "0.50% and 4.0%" fee
3 | range, executed the agreement, and returned it to Apollo.

4 |     37.   The next day, June 20, 2008, Apollo received an ACOF investor
5 | disclosure letter. The letter, which acknowledged a fee ranging between "0.50%
6 | and 4.0% of CalPERS capital commitment" was dated "5/20/08" and bore
7 | Buenrostro's signature. Apollo's in-house counsel then emailed Apollo's Director
8 | of Marketing, two attorneys at Apollo's outside law firm at the time, and
9 | ARVCO's General Counsel, writing, "I have received the Investor Disclosure.
10 | When I return the fully executed original, I will also include the copy of the other
11 | Investor Disclosure as you requested."

12 |     38.   Like the other investor disclosure letters discussed above, the ACOF
13 | disclosure letter contains many irregularities, one of which was the "5/20/08" date
14 | on the letter. CalPERS had stripped Buenrostro of all authority and replaced him
15 | as CEO on May 12, 2008. Accordingly, on May 20, 2008, Buenrostro had no
16 | authority to sign anything on behalf of CalPERS. Buenrostro did not actually sign
17 | the ACOF investor disclosure letter after he was relieved of his authority in May
18 | 2008.

19 |     39.   Rather, one of the blank documents that Buenrostro had signed in
20 | January 2008 was mistakenly printed with the SOMA (as opposed to ACOF)
21 | disclosure language, dated "5/20/08," and, on June 13, 2008, emailed and
22 | overnighted to Apollo. On June 16, 2008, Apollo sent the letter to outside counsel
23 | at another law firm, who promptly told Apollo that the letter was unsatisfactory
24 | *because it was for the wrong Apollo fund.*

25 |     40.   Sometime between June 16 and June 19, 2008, Villalobos learned that
26 | his staff had sent Apollo the wrong disclosure letter. Villalobos called his assistant
27 | and another employee into his office, retrieved another blank document with
28 | Buenrostro's signature from a folder behind his desk, and ordered the assistant to

13

add the ACOF disclosure language above Buenrostro's signature. The assistant followed Villalobos' instructions, and the replacement disclosure letter was sent to Apollo by FedEx on June 19, 2008, along with the signed original of the ACOF placement agreement itself.

41. A few days after receiving the replacement disclosure letter, Apollo wired ARVCO over $4 million in partial payment of the ACOF fees; by February 2009, Apollo had paid ARVCO more than $7.5 million in ACOF fees. Apollo stopped paying fees to ARVCO once it learned about various government investigations into ARVCO's activities.

## FIRST CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### In Violation of Section 17(a)(1) of the Securities Act
### (Against All Defendants)

42. The Commission realleges and incorporates by reference ¶¶ 1 through 41 above.

43. The Defendants, and each of them, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly with scienter, employed devices, schemes, or artifices to defraud.

44. By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## SECOND CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE
## PURCHASE OR SALE OF SECURITIES
### In Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5(a) and Rule 10b-5(c) thereunder
### (Against All Defendants)

45. The Commission realleges and incorporates by reference ¶¶ 1 through 41 above.

46. The Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

- employed devices, schemes, or artifices to defraud; or
- engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

47. By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

I.

Issue findings of fact and conclusions of law that the Defendants committed the alleged violations.

II.

Issue judgments, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining the Defendants, and their officers,

agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. §§ 77q(a).

### III.

Issue judgments, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining the Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### IV.

Order the Defendants to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

### V.

Order the Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other and further relief as this Court may determine to be just and necessary.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

DATED: April 23, 2012

Respectfully submitted,

/s/ Leslie A. Hakala
LESLIE A. HAKALA
Attorney for Plaintiff
Securities and Exchange Commission